# Illinois Official Reports

## Appellate Court

---

*People v. Coty*, **2018 IL App (1st) 162383**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM COTY, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-16-2383 |
| Filed | August 8, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-30062; the Hon. Nicholas Ford, Judge, presiding. |
| Judgment | Sentence vacated.<br>Reversed and remanded with instructions. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Daniel T. Mallon, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, and Kimberly M. Foxx, State's Attorney, both of Chicago (Gopi Kashyap, Assistant Attorney General, and Alan J. Spellberg and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.<br>Justices Howse and Lavin concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a jury trial, the defendant, William Coty, who is intellectually disabled,[1] was convicted, *inter alia*, of predatory criminal sexual assault of a minor. Because the defendant had a prior conviction for aggravated criminal sexual assault, pursuant to section 12-14.1(b)(2) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12-14.1(b)(2) (West 2004)),[2] the trial court had no discretion but to sentence him to mandatory natural life in prison without the possibility of parole. After his conviction and sentence were affirmed on appeal (see *People v. Coty*, 388 Ill. App. 3d 1136 (2009) (table) (unpublished order under to Supreme Court Rule 23) (hereinafter *Coty I*)), the defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Civil Procedure Code) (735 ILCS 5/2-1401 (West 2004)), alleging, *inter alia*, that his mandatory natural life sentence was (1) facially unconstitutional under the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and (2) unconstitutional as applied to him under the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11) due to his intellectual disability. After the trial court *sua sponte* dismissed the defendant's petition, the defendant appealed to this court.

¶ 2    On appeal, we affirmed in part and reversed in part, holding that, while the defendant had failed to establish that his mandatory natural life sentence was facially unconstitutional under the eighth amendment, that same sentence was unconstitutional as applied to him under the proportionate penalties clause. See *People v. Coty*, 2014 IL App (1st) 121799-U, ¶¶ 60-75 (hereinafter *Coty II*). We therefore vacated the defendant's sentence and remanded the cause to the trial court for resentencing. *Id.* ¶ 77.

¶ 3    On remand, the defendant, who was then 52 years old, was resentenced to 50 years' imprisonment. The defendant now appeals from that sentence contending that the trial court abused its discretion when it imposed an extended term sentence that was the equivalent of a natural life sentence. In the alternative, the defendant contends that his 50-year *de facto* life sentence is unconstitutional under both the federal and state constitutions, as applied to him, an intellectually disabled person. For the reasons that follow, we vacate the defendant's sentence and reverse and remand for a new sentencing hearing, with instructions.

## I. BACKGROUND

¶ 5    Because we have already articulated the facts of this case in our prior two orders, we set forth only the facts and procedural history that are relevant to the resolution of this appeal.

## A. Fitness Hearing

¶ 7    The defendant was arrested and charged on November 21, 2004. Prior to trial, the court held a fitness hearing to determine whether the defendant was fit to stand trial. At that hearing, the State called Dr. Debra Ferguson, a forensic clinical services psychologist from the forensic

---

[1] We acknowledge that the term "mentally retarded" was used in the initial appeal in this case, as that was the term used during the trial proceedings and in all relevant case law. However, because that term is no longer the preferred nomenclature, for purposes of this appeal we will use "intellectually disabled."

[2] We note that section 12-14.1(b)(2) was recodified as section 11-1.40(b)(2) (see 720 ILCS 5/11-1.40(b)(2) (West 2010)) and became effective July 1, 2011.

clinical services office of the circuit court. Dr. Ferguson testified that the defendant "had a very basic knowledge of most legal proceedings" and that the things "he was not familiar with, he was able to understand with an explanation and to retain and *** repeat it." According to Dr. Ferguson, for example, the defendant understood that a judge was the person who "sentences you," that he was the defendant in the case, and that the jury was "some crazy people that sit up in some room. They say what they say. They can't judge me." The defendant understood that jurors "talk about the case in a room and give a paper that read[s] guilty or not guilty." Dr. Ferguson acknowledged that the defendant did not know the role of the prosecutor but averred that, after she explained it, the defendant acknowledged that the prosecutor was not "on [his] side." Dr. Ferguson further opined that the defendant was aware of his charges, the allegations against him, and the possible penalties (which he described to her as, "I know I can get 6 to 30[.] I know that."). Dr. Ferguson further acknowledged that the defendant initially did not understand that he could choose whether to proceed with a bench or jury trial but instead believed that this was a decision reserved to the trial judge. Nonetheless, she averred that, after she explained, the defendant understood that it was his option. Dr. Ferguson opined that based on her examination the defendant was fit to stand trial.

¶ 8 On cross-examination, Dr. Ferguson was asked whether she was aware that the defendant was receiving Social Security disability based on his intellectual disability.[3] She acknowledged that she was aware of this fact but was unable to confirm the intellectual disability for which the defendant was receiving disability checks. She admitted that her office had requested this information from the Social Security office but then "gave up waiting for it and filed [the] report" attesting to the defendant's fitness.

¶ 9 On cross-examination, Dr. Ferguson further admitted that she did not perform any standardized tests to evaluate the defendant's intellectual disability but acknowledged that it was her understanding that his full scale IQ score was 65.

¶ 10 On redirect examination, Dr. Ferguson admitted that it was her opinion that the defendant was in fact mildly intellectually disabled[4] but testified that a diagnosis of intellectual disability does not "tell *** anything about whether an individual is fit or unfit" to stand trial.

¶ 11 In opposition, the defendant called Dr. Sandra Dawkins, who was qualified as an expert in clinical psychology. Dr. Dawkins testified that the defendant's full scale IQ was 55, which placed him in the "extremely low" range of intelligence when compared to normal adults, so as to make him unfit to stand trial. Dr. Dawkins explained that in coming to her conclusion she, *inter alia*, (1) interviewed the defendant on two occasions; (2) reviewed numerous documents, including his entire forensic clinical services record, court records, and police records; and (3) administered four scientifically recognized standardized tests to evaluate his cognitive ability,[5] his adaptive behavior,[6] his competency to understand *Miranda* warnings,[7] and his competency to stand trial as an intellectually disabled person.[8] Among other things, Dr. Dawkins opined that under the Social Security disability standards an individual is eligible for

---

[3]The term used was "mental retardation."

[4]Again the term "mentally retarded" was used.

[5]The Wechsler Adult Intelligence Scale (WAIS-III) (otherwise known as an IQ test)

[6]The Adaptive Behavior Assessment System-II (ABAS-II)

[7]The Assessing Understanding and Appreciation of Miranda Rights test

[8]The Competency Assessment to Stand Trial for the Mentally Retarded (CAST-MR)

intellectual disability benefits with an IQ score of 59 or under. She stated that the results of the IQ test she administered on the defendant were consistent with the defendant receiving Social Security benefits. She pointed out that the defendant received a verbal score of 55, a performance score of 64, and a full scale IQ score of 55, which placed him in the "one percent of the population who retain IQ scores at that level."

¶ 12 Dr. Dawkins also testified regarding her interviews with the defendant and stated that the defendant's concentration level was variable, that he had a very short attention span, and that he had difficulty explaining similarities. In addition, while he knew where he was and what the date was, he could provide neither the day of the week nor the approximate time of day. When asked how he knew the date, he stated, "It is my court date. That is what I have been told."

¶ 13 Dr. Dawkins further averred that, throughout the interviews, the defendant's responses were very inconsistent. She explained that there were elements of his statements that would imply he had an understanding of the court system, but when any one particular concept was explored further it became apparent that the defendant did not, in fact, understand it. She stated that once she explained certain concepts to him, he would easily acquiesce to the point, accept her explanation, and regurgitate it. She explained that this allowed him to feel calmer and not worry. According to Dr. Dawkins, the defendant does "not accept that he is as cognitively limited as he is, so he projects an image that he knows more than what he actually knows." In that respect, he has acquired a lot of "street jargon" and "tries to portray himself as being more knowledgeable about the world around him than he actually is."

¶ 14 In addition, Dr. Dawkins testified that she interviewed the defendant's sister and uncle as part of the adaptive behavior test. She opined that the results of that test showed that the defendant would have "a very, very difficult time functioning in society independently," and would require "support in the work world, at home, [and] caring for his personal decision making." She stated that the defendant "acts without considering the consequences of his actions" and is therefore "easily exploited," both because of his "low mental ability" and desire to "fit in."[9]

¶ 15 After hearing the evidence and arguments by both parties, the trial court found that, although it was undisputed that the defendant was intellectually disabled,[10] he was nevertheless fit to stand trial.

¶ 16 B. Motion to Suppress Confession

¶ 17 Prior to trial, the parties also litigated the defendant's motion to suppress inculpatory statements he had made to police. At a hearing on that motion, the following evidence was presented regarding the defendant's cognitive abilities. The State again called expert forensic psychologist Dr. Ferguson, who was now tasked with determining whether the defendant was capable of understanding his *Miranda* rights. Dr. Ferguson averred that, in order to assess this

---

[9]Dr. Dawkins's report, which is part of the record on appeal, further notes that when she interviewed the defendant she was struck by the fact that although he was 41 years old, he was very small (approximately 5'5" in height at 120 lbs) and had a "childlike demeanor," so much so that he could be mistaken for a child, until one looked at his face. Dr. Dawkins's report further notes that throughout her interaction with the defendant, he exhibited noticeable shaking. When asked why he was shaking, the defendant stated that he "always had and that [this] was why his nickname was 'Shakey.' "

[10]The trial court used the term "mentally retarded."

- 4 -

ability, she performed only one part of the four-part "Grisso scales" test on the defendant, specifically, the function of rights in interrogation part.[11] According to Dr. Ferguson, the defendant successfully applied the *Miranda* warnings he had received to a hypothetical situation and therefore passed this portion of the "Grisso scales" test. Dr. Ferguson also averred that, during her interview with the defendant, the defendant exhibited an understanding of his *Miranda* rights. In particular, Dr. Ferguson explained that the defendant had acknowledged to her that the police read him his *Miranda* rights. When asked to explain what those rights entailed, the defendant told Dr. Ferguson, "yeah I know they [*sic*] supposed to read you your rights *** I'm slow but I ain't that slow. They have to read you your rights. They can't just lock you up like that without reading you your rights."

¶ 18     In opposition to the State's testimony, the defendant called his own expert, Dr. Michael Fields. Unlike Dr. Ferguson, Dr. Fields testified that to determine the defendant's ability to understand *Miranda*, he administered the full Grisso scales test. Dr. Fields testified that the defendant scored poorly on all four parts of that test. In addition, he stated that during his interview with the defendant, the defendant could not name his *Miranda* rights. Based on the above, Dr. Fields opined that "there were significant doubts about [the defendant's] ability to understand *Miranda*." However, when questioned further, Dr. Fields acknowledged that he could not state with certainty that the defendant was categorically unable to understand those rights.

¶ 19     The trial court denied the defendant's motion to suppress his statements to police, noting that Dr. Ferguson's interview provided the stronger and better evidence of the defendant's capacity to understand *Miranda*. The court stated that Dr. Fields articulated an equivocal opinion that lacked certainty, and that his opinion was based more on testing than on a clinical interview of the defendant.

¶ 20                                          C. Jury Trial

¶ 21     At trial, the victim K.W. testified that she was six years old in November 2004 and that the defendant, whom she knew as "Shakey," lived as a boarder in her grandparents' house. The defendant lived in the basement, as did K.W.'s parents and siblings, and K.W. was allowed to sleep in the basement or upstairs with her grandparents. K.W. testified that on November 18, 2004, she was watching TV alone in the defendant's room in the basement, while her parents and cousin were asleep. She stated that she was wearing a T-shirt, skirt, and underwear. K.W. averred that the defendant came into the room and sat down on the couch with her. He then started to "scooch" toward her, and every time she moved away, he moved closer until she could no longer move. K.W. stated that the defendant then touched her arm, her shoulder, and her leg and then "started messing with me down there." She identified that part of her body as the "part that [she] use[s] to go to the bathroom with." K.W. then explained that the defendant had "not [touched her] with his hand, but with his tongue" and indicated that she was on the

---

[11]The "Grisso scales" test, otherwise knowing as the *Comprehension of Miranda Rights: Manual for Administration and Scoring*, provides four instruments by which mental health professionals may assess the capacity of individuals to appreciate and understand the significance of their *Miranda* rights. These include (1) the comprehension of *Miranda* rights, (2) the comprehension of *Miranda* rights recognition, (3) the comprehension of *Miranda* vocabulary, and (4) the function of rights in interrogation.

floor when he pushed her underwear to the side of her leg and did so. The defendant then told K.W., "you won't tell anyone." K.W. immediately went and woke her mother and told her that the defendant had "messed with her down there."

¶ 22    On cross-examination, K.W. denied telling the police that the defendant touched her vagina with his hand and insisted that she had told them that he had used his tongue. She similarly admitted that she did not tell the emergency room physician that the defendant had used his tongue. When asked to explain why she did not tell the emergency doctor that the defendant had licked her instead of touched her, K.W. stated that she forgot.

¶ 23    K.W.'s mother, Keafa W., next testified that, on the night in question at about 11 p.m., K.W. came into her room and told her "Shakey touched me," patting her vaginal area to show where she had been touched. Keafa woke her husband up, and they went upstairs with K.W. to talk to K.W.'s grandparents. While they were upstairs, Keafa heard the front door close, and her husband observed the defendant leaving.

¶ 24    On cross-examination, Keafa admitted that K.W. never told her that the defendant licked her and that she only accused him of "touching her." Keafa also acknowledged that she did not call the police until the next afternoon, November 19, 2004, but stated she did not do so because she was waiting for K.W.'s grandparents to do so.

¶ 25    Pediatric emergency physician Dr. Gail Allen testified that she examined K.W. on November 21, 2004, and that, during that exam, K.W. pointed at her vagina and told her that the defendant had "touched her." Dr. Allen stated that K.W.'s physical examination was "normal" and that she found no signs of penetration, trauma, or "touching."

¶ 26    On cross-examination, Dr. Allen acknowledged that K.W. did not tell her that the defendant had touched her with his tongue. She also admitted that K.W.'s chart from the emergency room visit revealed that K.W. had told a resident that she was wearing shorts and not a skirt on the night of the incident.

¶ 27    Chicago police officer Donald Story next testified that at about midnight on November 21, 2004, he and his partner, Officer Elkins, arrested the defendant at his sister's home. Once in the police car, Officer Elkins informed the defendant of his *Miranda* rights and asked him if he wanted to answer the police officers' questions. According to Officer Story, the defendant agreed and asked what the arrest was about. Upon being told of the allegations, the defendant told the officers that K.W. "came into [his] room, sat on [his] lap, [and] rubbed around a little bit."

¶ 28    Assistant State's Attorney (ASA) Dean Fugate testified that on November 22, 2004, he spoke to the defendant at Area 1 police station in the presence of two detectives, Mirandized the defendant and then took down his handwritten statement.[12] That statement was published to the jury. In the statement, the defendant confirmed that he was 40 years old and that, in November 2004, he rented a room in the basement of 7036 South Aberdeen Avenue in Chicago, where he shared the basement with K.W. and her family. The defendant stated that on November 18, 2004, he was changing his clothes in his bedroom with his door open when K.W. walked into the room. He told K.W. to leave, but she would not. The defendant finished changing his clothes behind a curtain and then sat on his couch. He averred that K.W. then sat on his lap and "began grinding her butt on his lap." The defendant stated that "his penis was

_____

[12]Because the defendant was illiterate, ASA Fugate handwrote the statement for the defendant, and the defendant "signed" each page.

hard" but claimed that he and K.W. were both clothed.[13] He placed his right hand underneath K.W.'s clothes, touched her vagina, and "inserted his finger into [K.W.'s] vagina up to the first joint." The defendant stated that he did not move his finger inside of K.W.'s vagina and that he kept it inside only for "one minute." The defendant averred that K.W. said, "that feels good."

¶ 29 In his statement, the defendant further added that K.W. pulled her shorts and panties down to her knees before sitting on his lap. The defendant also stated that after K.W. got off his lap and pulled her pants up, she left the room and went upstairs with her parents into her grandparents' room. The defendant then left the house out of the front door and went to his sister's house. He also stated that he "felt bad that he touched the little girl."

¶ 30 In his statement, the defendant also indicated that he understands and writes English but that he cannot read.

¶ 31 After the defendant's statement was read into the record, the State rested. The defense presented no witnesses, and the parties proceeded with closing arguments. The jury returned a verdict of guilty.

¶ 32                                       D. Original Sentencing Hearing

¶ 33 On November 17, 2006, the trial court held a sentencing hearing, wherein the defendant's sister, Irma Coty, testified regarding his cognitive disabilities. Irma testified that the defendant has been intellectually disabled since he was born, does "not understand what is going on," and needs psychiatric treatment. The original presentence investigation report (PSI), which was admitted into the record, revealed that the defendant attended special education classes in the Chicago public school system up until the eighth grade and that he received Social Security disability from the State of Illinois because of his mental health. The original PSI noted that the defendant had undergone a behavioral clinical examination (BCX) as part of his evaluation for his fitness to stand trial and that the BCX was part of the court record. In addition, the original PSI revealed that the defendant could not read or write. The original PSI further revealed that the defendant's sister Irma "takes care of him, handles his finances and helps him with his daily routine."

¶ 34 Despite the aforementioned evidence, based upon the defendant's prior conviction for aggravated criminal sexual assault in case No. 88 CR 12137,[14] the court sentenced the defendant to natural life in prison, pursuant to the mandates of section 12-14.1(b)(2) of the Criminal Code (720 ILCS 5/12-14.1(b)(2) (West 2004)). In doing so, the trial judge noted that he would not have sentenced the defendant to natural life but that he was bound by statute to do so. As the court explained:

> "[T]he parties recognize that the court's hands are tied because of the prior conviction for aggravated criminal sexual assault, which makes this conviction one for which he must receive a sentence of life imprisonment without parole. The facts of the cause certainly warrant a substantial sentence here. It would not be the sentence that the

_____

[13]ASA Fugate acknowledged that the defendant initially said that the victim's pants were on throughout the incident. ASA Fugate subsequently claimed, however, that while giving the handwritten statement, the defendant changed his story and averred that the victim removed her pants during the incident.

[14]The defendant committed this crime in 1988 when he was 24 years old. The victim in that case was nine. The defendant was sentenced to, and served, six years in prison.

court is required to give, had I any discretion, but I must follow the law nonetheless. The legislature has determined a second aggravated criminal sexual assault in one's lifetime means what they say it means."

¶ 35                                       E. Direct Appeal

¶ 36        The defendant subsequently appealed his conviction, arguing that (1) he was denied his due process right to notice, (2) the testimony of Dr. Allen was inadmissible hearsay and violated his right to confrontation, (3) he was denied his right to a fair trial because of improper prosecutorial comments, and (4) he was denied his right to effective representation of counsel where counsel failed to object to the prosecutor's comments and failed to impeached K.W.'s trial testimony with her prior inconsistent statements. See *Coty I*, slip order at 1. On March 27, 2009, this court affirmed the defendant's conviction and sentence. *Id.* at 25. His petition for leave to appeal to the Illinois Supreme Court was denied on September 30, 2009. See *People v. Coty*, 233 Ill. 2d 571 (2009).

¶ 37                              F. Petition for Relief From Judgment

¶ 38        On March 8, 2012, the defendant filed a *pro se* section 2-1401 petition for relief from judgment (735 ILCS 5/2-1401 (West 2012)), alleging that his mandatory natural life sentence was unconstitutional because the trial court was prohibited from considering his individual characteristics (namely his intellectual disability) and the circumstances of the offense in ordering that sentence. The defendant acknowledged that his petition was untimely under the statute (*id.*) but claimed that his sentence was void and that therefore he could challenge it at any time. The defendant asked the trial court to vacate his sentence and remand for resentencing in the 6-to-30-years range. The State did not file any response to the defendant's petition.

¶ 39        On May 10, 2012, the trial court *sua sponte* dismissed the defendant's petition. In its written order, the court first held that the petition was untimely because it was filed over five years after the defendant's conviction on October 11, 2006, which was contrary to the mandate of the statute that it be filed within two years after the entry of final judgment. See *id.* The court also found that the defendant had failed to establish that the sentencing scheme under which he was sentenced to life imprisonment was unconstitutional.

¶ 40                                  G. Appeal and Remand

¶ 41        The defendant appealed the dismissal of his section 2-1401 petition to this court. On appeal, we affirmed in part, reversed in part, and remanded for further proceedings. See *Coty II*, 2014 IL App (1st) 121799-U, ¶ 78. In doing so, we first found that the trial court erred in *sua sponte* dismissing the defendant's petition on the basis of timeliness. *Id.* ¶¶ 35-42. We then considered the merits of the defendant's petition and held that, while the defendant had failed to properly state a facial challenge to the mandatory sentencing scheme under which he was sentenced to natural life in prison, that same scheme was unconstitutional as applied to him, under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because of his intellectual disability and corresponding diminished culpability. *Coty II*, 2014 IL App (1st) 121799-U, ¶¶ 43-75. In doing so, we recognized that the defendant was intellectually disabled with an IQ score somewhere between 55 and 65. *Id.* ¶ 66. As a result, under our prevailing social norms, his culpability was less than that of a person with normal

cognitive capacity. *Id.* In addition, we held, "it cannot be ignored that the offense [albeit serious] *** included a single, brief act of penetration that did not result in any physical injury to the victim." *Id.* ¶ 67. We further noted that the encounter was neither orchestrated nor preplanned but "rather was seemingly impulsive, and the defendant expressed remorse over what he had done." *Id.* Accordingly, we vacated the defendant's sentence and remanded to the trial court for resentencing to give the trial court discretion to impose a term of years. *Id.* ¶ 78.

¶ 42                                             H. Resentencing

¶ 43        On remand, a new sentencing hearing was held on August 10, 2016. No new evidence was presented at that hearing regarding the defendant's circumstances over the decade that had passed since he was first sentenced. Instead, prior to the hearing, the court noted that the appellate court had remanded the matter for resentencing, "indicating that Judge Toomin had observed during the course of the original trial that [the defendant] suffered from an intellectual disability." At the hearing, the court stated it had been "tendered a large volume of materials," which included "the transcript of the original trial, and the sentencing that occurred, incorporating the testimony of a doctor who testified regarding [the defendant's] intellectual difficulties or disabilities. I am taking all that into account." After questions from defense counsel, the court also acknowledged that it had reviewed the expert opinion given at the defendant's motion to suppress hearing, as well as the *new* PSI.[15]

¶ 44        The parties then proceeded with very brief arguments. In aggravation, the State, *inter alia*, argued that the victim's mother was "very troubled by the fact that the defendant had to be resentenced" and wanted "her feelings" represented to the court. The State further argued the offense was serious and that the defendant knew what he was doing when he approached the victim. The State therefore asked for "a significant number of years."

¶ 45        In mitigation, defense counsel argued that, in remanding for resentencing, this court had already found that the crime was a single contact lasting less than a minute and was impulsive rather than preplanned or orchestrated. Additionally, the defendant had expressed remorse over what he had done. Defense counsel further argued that it was undisputed that the defendant was intellectually disabled and therefore less culpable. Accordingly, defense counsel asked that the court give the defendant "a term of years that allows him upon sufficient punishment to resume some sort of life following incarceration."

¶ 46        After hearing arguments, the trial court sentenced the defendant to 50 years in prison to be served at 85%, followed by 3 years to life of mandatory supervised release (MSR). In entering this sentence, the court stated:

> "William, I'm going to consider today the evidence presented at trial, the [new] pre-sentence report, the evidence offered in aggravation, mitigation, the statutory factors in aggravation, mitigation, the financial impact of incarceration, the arguments

---

[15]We note that the record contains two new PSI reports, one dated December 18, 2014, and the other dated March 21, 2016. These two PSI reports are almost identical and make no reference to the defendant's intellectual disability or his behavior/actions in the last 10 years of incarceration. With respect to the defendant's psychological health history, both new PSIs merely report that the defendant states that he has never been treated by a mental health professional. In addition, under the rubric "Attitudes/Values," the new PSIs simply state that "[t]he defendant's criminal background indicates an anti-social personality" and that "[h]is previous behavior reflects a lack of social conformity."

the attorneys just made here moments [a]go, and the assertions relative to the mother of the victim indicating that she still takes this case seriously, this was a serious case, and this was an offense committed by somebody whom this was not the first."

¶ 47 Defense counsel subsequently filed a motion to reconsider, arguing, *inter alia*, that (1) the sentence was excessive in light of the defendant's background and the nature of the offense, citing the proportionate penalties clause, (2) the court improperly considered in aggravation matters that were implicit in the offense, and (3) the State failed to prove eligibility for an enhanced penalty or extended term. The trial court denied this motion, and the defendant now appeals.

¶ 48                                    II. ANALYSIS

¶ 49 On appeal, the defendant makes three arguments regarding his sentence. First, he asserts that the trial court abused its discretion in sentencing him to a 50-year extended term sentence, without properly considering that it was, in fact, imposing a *de facto* life sentence on a defendant with intellectual disabilities. Second, the defendant contends that the imposition of this *de facto* life sentence is unconstitutional as applied to him both under the eighth amendment and the proportionate penalties clause. For the reasons that follow, we agree with the latter contention.

¶ 50                              A. Abuse of Discretion

¶ 51 At the outset we acknowledge our supreme court's mandate that we consider nonconstitutional arguments before considering constitutional ones (*In re E.H.*, 224 Ill. 2d 172, 178 (2006)). Accordingly, we must first consider whether the trial court abused its discretion in sentencing the defendant to 50 years' imprisonment in light of our prior mandate. A reviewing court will find an abuse of discretion only where the sentencing decision is fanciful, unreasonable, or arbitrary and no reasonable person would take the view adopted by the trial court. *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 32.

¶ 52 Our decision to resentence the defendant was filed on August 28, 2014. There, presented with a mandatory natural life sentence, we held that resentencing was necessary under the proportionate penalties clause because the statutory scheme precluded the sentencing court from considering the unique characteristics of the intellectually disabled defendant. See *Coty II*, 2014 IL App (1st) 121799-U, ¶¶ 61-75. Our analysis, however, did not address whether a sentencing court *must* consider whether an intellectually disabled defendant has characteristics accompanying that disability that reduce his culpability. In addition, based on the law in existence at the time, our decision did not address whether, under either the state or federal constitutions, a *de facto* life sentence or a discretionary life sentence would be unconstitutional as applied to the intellectually disabled defendant in this case. In fact, our mandate nowhere directed that the trial court was required to consider the defendant's intellectual disability and accompanying characteristics in issuing a sentence. Instead, we only stated, "the defendant, who is [intellectually disabled], should not have been sentenced to mandatory natural life imprisonment, *without the trial court having had an opportunity to consider* his mental capacity and the facts surrounding the commission of the offense." (Emphasis added.) *Id.* ¶ 75. We therefore remanded "for resentencing before a court that has discretion to impose a term-of-years sentence." *Id.* ¶ 77.

¶ 53    On remand, the trial court imposed a term of years within the appropriate sentencing range.[16]

¶ 54    In doing so, the trial court acknowledged the defendant's intellectual disability but found that other factors warranted a 50-year prison term. Although the trial court's findings in this respect are, at best, sparse, the trial court explicitly stated it considered the evidence presented at the defendant's trial and the parties' arguments, both of which referenced the defendant's disability at the time of his trial in 2006. Since the trial court did no more or less than we instructed it to do, we find no abuse of discretion. See *Abrams*, 2015 IL App (1st) 133746, ¶ 33.

¶ 55                              B. Constitutional Arguments

¶ 56    That said, however, we are now asked to determine for the first time whether the defendant's 50-year prison term constitutes a *de facto* life sentence imposed in a manner inconsistent with the eighth amendment and the proportionate penalties clause. As shall be fully discussed below, we find that the trial court on remand imposed a discretionary *de facto* life sentence without a record sufficient to assess the unique factors that can impact the culpability of the intellectually disabled. We hold that this procedure resulted in constitutional error. See Ill. Const. 1970, art I, § 11.

¶ 57    The defendant challenges his sentence both under the eighth amendment and the proportionate penalties clause. As an initial matter, the State argues that the defendant has forfeited any constitutional arguments by failing to properly preserve them below but then concedes that our supreme court has urged that "the interests of judicial economy favor addressing [such] issue[s] on direct appeal rather than requiring defendant to raise [them] in a separate postconviction petition." *People v. Cregan*, 2014 IL 113600, ¶ 18. The defendant responds that he has properly preserved the proportionate penalties issue by raising it in his postsentencing motion and urges us to consider his eighth amendment challenge under the plain error doctrine. While we would reach the same result under both the federal and state constitutions, because the defendant only raised the proportionate penalties argument in his motion to reduce his sentence, we will proceed with the merits of that claim alone.

¶ 58    The Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art I, § 11. "[T]he framers [of the Illinois Constitution] intended *** to provide a limitation on penalties beyond those afforded by the eighth amendment." *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 69; *People v. Harris*, 2016 IL App (1st) 141744, ¶ 40. And our supreme court has held that it is inaccurate to state that these two constitutional provisions are synonymous, although the relationship between them is certainly unclear. See *People v. Clemons*, 2012 IL 107821, ¶¶ 36-37, 40 (holding that the proportionate penalties clause "focuses on the objective of rehabilitation" and places greater limitations on the legislature's ability to prescribe harsh sentences than the eighth amendment). But see *People v. Patterson*, 2014 IL 115102, ¶ 106. Nevertheless, our supreme court has never shied

---

[16]As a Class X offender the defendant was punishable by a sentencing range between 6 and 30 years. 730 ILCS 5/5-8-1(a)(3) (West 2004). In addition, because the victim was under 18 years of age, the defendant was further eligible for an extended term sentence up to 60 years' imprisonment (*id.* § 5-5-3.2(c)).

from applying eighth amendment precedent to decide proportionate penalties cases, and we see no reason why we should not do the same here. See, *e.g.*, *People v. Miller*, 202 Ill. 2d 328, 339 (2002) (hereinafter *Leon Miller*); see also *Patterson*, 2014 IL 115102, ¶ 106.

¶ 59    To succeed on a proportionate penalties claim, the defendant here must show either (1) that the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community or (2) that similar offenses are compared and the conduct that creates a less serious threat to the public health and safety is punished more harshly. *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009); see also *Leon Miller*, 202 Ill. 2d at 338.

¶ 60    Our supreme court has repeatedly refused to define what kind of punishment qualifies as cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community, because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Leon Miller*, 202 Ill. 2d at 339 (citing *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (whether a punishment shocks the moral sense of the community is based upon an "evolving standard[ ] of decency that mark[s] the progress of a maturing society")).

¶ 61    Noting that our supreme court has repeatedly held that those "evolving standard[s] of decency *** mark[ ] the progress of a maturing society," in *Coty II*, we reviewed the gravity of the defendant's offense in connection with the severity of his sentence within our community's evolving standard of decency. (Internal quotation marks omitted.) *Coty II*, 2014 IL App (1st) 121799-U, ¶ 62.

¶ 62    At the time we decided *Coty II*, that standard had evolved to prohibit the imposition of the death penalty on juveniles and intellectually disabled offenders, as well as to condemn the imposition of mandatory natural life imprisonment on juveniles. See *id.* ¶ 63 (citing *Graham v. Florida*, 560 U.S. 48, 68 (2010), *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005), *Miller v. Alabama*, 567 U.S. 460, 488-89 (2012),[17] and *Atkins v. Virginia*, 536 U.S. 304, 321 (2002)). Accordingly, in *Coty II*, we held that the statutory provision under which the defendant had been sentenced to mandatory natural life imprisonment, without the trial court having any discretion, was disproportionate as applied to him, so as to shock the moral sense of our community. *Id.* ¶¶ 64-69 (citing *Leon Miller*, 202 Ill. 2d at 339-42).

¶ 63    Since our decision in *Coty II*, our community's standards of decency have considerably evolved, albeit in the context of juvenile defendants and the eighth amendment (U.S. Const., amend. VIII). First, in *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), the

___

[17]*Roper* held that the eighth amendment prohibited death penalty sentences for juveniles who commit murder. *Roper*, 543 U.S. at 578-79. *Graham* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit nonhomicide offenses. *Graham*, 560 U.S. at 82. *Miller* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit murder. *Miller*, 567 U.S. at 489-90. All three decisions recognized the following general difference between juveniles and adults, which render juveniles less morally reprehensible: (1) lack of maturity and underdeveloped sense of responsibility; (2) vulnerability and susceptibility to negative influences and outside pressures; and (3) a yet unfully formed character, which makes them more malleable and their malfeasance less indicative of irretrievable depravity. *Graham*, 560 U.S. at 68; *Roper*, 543 U.S. at 569-70. In *Miller*, the Supreme Court further held that "children are constitutionally different from adults for purposes of sentencing" and that a trial court must therefore be able to consider mitigating factors in determining whether to impose a natural life sentence. *Miller*, 567 U.S. at 471.

United States Supreme Court held that state courts must give *Miller* effect in collateral proceedings and that, under *Miller*, life imprisonment without parole is unconstitutional for juvenile offenders "whose crimes reflect the transient immaturity of youth" "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at ___, 136 S. Ct. at 734.

¶ 64    Next, in *People v. Reyes*, 2016 IL 119271, ¶ 9, our supreme court interpreted the holding of *Miller* to apply to *de facto* as much as *de jure* life sentences. Noting that *Miller*'s "holding required that life-without-parole sentences be based on judicial discretion rather than statutory mandates" (*id.* ¶ 4), our supreme court held:

> "A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *Id.* ¶ 9.

¶ 65    In addition our supreme court held:

> " '[T]he teachings of the *Roper*/*Graham*/*Miller* trilogy require sentencing courts to provide an individualized sentencing hearing to weigh the factors for determining a juvenile's "diminished culpability ***" when, as here, the aggregate sentences result in the functional equivalent of life without parole. To do otherwise would be to ignore the reality that lengthy aggregate sentences have the effect of mandating that a juvenile "die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence *** more appropriate." [Citation.] Such a lengthy sentence " 'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the juvenile convict], he will remain in prison for the rest of his days.' " [Citation.] That is exactly the result that *Miller* held was unconstitutional. [Citation.]' " *Id.* (quoting *Bear Cloud v. State*, 2014 WY 113, ¶ 33, 334 P.3d 132 (Wyo. 2014)).

¶ 66    Subsequently, in *People v. Holman*, 2017 IL 120655, our supreme court interpreted *Miller* to apply to discretionary, as much as mandatory, natural life sentences. *Id.* ¶ 40. The court there held that "[l]ife sentences, *whether mandatory or discretionary*, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." (Emphasis added.) See *id.* (interpreting *Miller*, 567 U.S. at 465, and *Montgomery*, 577 U.S. at__, 136 S. Ct. at 736). Noting that Illinois courts have always held that age is a complex sentencing factor, our supreme court instructed that, before imposing either a mandatory or a discretionary natural life sentence on a juvenile, the trial court *must* first determine that the juvenile's conduct showed "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation," by considering the characteristics specific to juveniles articulated by the Supreme Court in *Miller*. *Id.* ¶ 46.[18]

---

[18]Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and

¶ 67    Aside from our supreme court's holdings in *Holman* and *Reyes*, since our decision in *Coty II* numerous panels of our appellate court have explicitly held that discretionary *de facto* life sentences for juveniles are unconstitutional under the eighth amendment. See, *e.g.*, *People v. Morris*, 2017 IL App (1st) 141117, ¶ 30; *People v. Nieto*, 2016 IL App (1st) 121604, ¶¶ 42-43, *pet. for leave to appeal pending*, No. 120826 (filed July 8, 2016); *People v. Smolley*, 2018 IL App (3d) 150577, ¶¶ 21-22; *People v. Ortiz*, 2016 IL App (1st) 133294, ¶ 24, *pet. for leave to appeal pending*, No. 121578 (filed Dec. 30, 2016); *People v. Buffer*, 2017 IL App (1st) 142931, ¶¶ 62-63, *appeal allowed*, No. 122327 (Ill. Nov. 22, 2017); *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶¶ 25-27, *pet. for leave to appeal pending*, No. 121275 (filed Oct. 12, 2016). But see *People v. Perez*, 2018 IL App (1st) 153629, ¶¶ 37-38; *People v. Hoy*, 2017 IL App (1st) 142596, ¶ 46, *pet. for leave to appeal pending*, No. 122911 (filed May 9, 2018); *People v. Jackson*, 2016 IL App (1st) 143025, ¶¶ 54-58, *pet. for leave to appeal pending*, No. 121527 (filed Nov. 3, 2016); *People v. Evans*, 2017 IL App (1st) 143562, ¶¶ 14-18, *pet. for leave to appeal pending*, No. 122701 (filed Sept. 19, 2017).

¶ 68    Accordingly, as of today, our community's standards of decency appear to have evolved to prohibit the imposition of *de jure* and *de facto* mandatory and discretionary life sentences for juveniles, where procedurally the court fails to consider the attendant characteristics of youth. See *Reyes*, 2016 IL 119271, ¶ 9; *Holman*, 2017 IL 120655, ¶ 46; *Buffer*, 2017 IL App (1st) 142931, ¶¶ 62-63.

¶ 69    In the midst of significant juvenile jurisprudence, however, one must not forget that such jurisprudence began with *Atkins* and the Court's concern with the intellectually disabled. See *Miller*, 567 U.S. at 483-84, 509 (citing *Atkins*, 536 U.S. at 316, 342). In *Coty II*, we already held that under *Atkins* adults with intellectual disabilities deserve special treatment in a proportionality analysis (see *Coty II*, 2014 IL App (1st) 121799-U, ¶¶ 61-75). In doing so, we only implied that adults with intellectual disabilities should be treated similarly to minors. *Id.* We now unequivocally hold that they should.

¶ 70    Intellectually disabled individuals, just like juveniles, are less culpable, where the deficiencies associated with intellectual disability "diminish their personal culpability." *Atkins*, 536 U.S. at 318. Indeed, "clinical definitions of [intellectual disability] require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.*; see also 730 ILCS 5/5-1-13 (West 2014) (defining intellectual disability as "sub-average general intellectual functioning generally originating during the developmental period and associated with impairment in adaptive behavior reflected in delayed maturation or reduced learning ability or inadequate social adjustment"). Intellectually disabled persons "frequently know the difference between right and wrong and are competent to stand trial," but "by definition[,] they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand others' reactions." *Atkins*, 536 U.S. at 318.

---

home environment; (3) the juvenile defendant's degree of participation in the crime and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. See *Miller*, 567 U.S. at 477-78.

- 14 -

¶ 71    Additional risks accompanying the unique characteristics of the intellectually disabled are the possibility that they will unwittingly confess to crimes they did not commit, their lesser ability to give their counsel meaningful assistance, and the fact that they are "typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id.* at 321. In addition, "there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and *** are followers rather than leaders." *Id.* at 318.

¶ 72    As such, just as "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders" (*Miller*, at 567 U.S. at 472), the distinctive attributes of the intellectually disabled, who are by their very nature less culpable, diminish "the interest in seeing that the offender gets his 'just deserts' " (*Atkins*, 536 U.S. at 319).

¶ 73    Similarly, with respect to deterrence, the same cognitive and behavioral impairments that make intellectually disabled individuals less morally culpable make it less likely that they can process the fact that their behavior exposes them to severe punishment. *Id.* at 320.

¶ 74    Because intellectually disabled offenders are so unlikely to process the possibility of receiving a sentence equivalent to natural life imprisonment, they are unlikely to control their conduct based on that information. *Id.* at 319-20. Simply put, an intellectually disabled defendant is far less likely than an average adult to understand the permanence of life in prison, let alone weigh the consequences of such a life against the perceived benefit of criminal conduct. As such, just as with minors, it is less likely that the possibility of facing such an extreme sanction will deter an intellectually disabled person from committing a crime. *Id.*

¶ 75    Accordingly, since we hold today that minors and adults with intellectual disabilities should be treated similarly in a proportionality analysis, we see no reason why, under our community's evolving standards of decency, the prohibition against the imposition of discretionary *de facto* life sentences without the procedural safeguards of *Miller* and its progeny should not be extended to intellectually disabled persons where the record shows that the trial court did not take into account those characteristics accompanying an intellectual disability as articulated in *Atkins*, so as to show "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. As *Atkins* articulated, those attendant characteristics include, but are not limited to, an intellectually disabled person's diminished capacity (1) to understand and process information, (2) to communicate, (3) to abstract from mistakes and learn from experience, (4) to engage in logical reasoning, (5) to control impulses, and (6) to understand others' actions and reactions, so as to be more susceptible to manipulation and pressure. *Atkins*, 636 U.S. at 318.

¶ 76    In reaching this decision, we acknowledge that thus far our supreme court has declined to extend the *Miller* line of cases to adults. See *People v. Thompson*, 2015 IL 118151, ¶¶ 8-21. That decision, however, did not involve intellectually disabled defendants. Moreover, we find that a different determination is warranted here. That is because the *Miller* line of cases began with *Atkins*, and explicitly relied on *Atkins*'s rationale pertaining to the intellectually disabled, to expand the law to juvenile defendants. See, *e.g.*, *Miller*, 567 U.S. at 483-84, 509 (citing *Atkins*, 536 U.S. at 316, 342); *Roper*, 543 U.S. at 560, 563-576 (discussing *Atkins*, 536 U.S. 304). As such, it is more accurate to state that *Miller* and its progeny are an extension of *Atkins*.

¶ 77　　Moreover, since we agree with those decisions that hold that the Illinois proportionate penalties clause is broader than the eighth amendment (see *Clemons*, 2012 IL 107821, ¶ 39; *Gipson*, 2015 IL App (1st) 122451, ¶¶ 69-70; *Harris*, 2016 IL App (1st) 141744, ¶ 38) and requires consideration of the constitutional objective of "restoring an offender to useful citizenship" (internal quotation marks omitted) (*Leon Miller*, 202 Ill. 2d at 338), an objective that is "much broader than defendant's past conduct in committing the offense" (see *Gipson*, 2015 IL App (1st) 122451, ¶ 72), we find that the procedural safeguards originating with *Atkins*, and created by *Miller* and its progeny, are applicable to intellectually disabled defendants under our constitution.

¶ 78　　We now turn to the sentencing of this defendant. As already noted above, the defendant here was convicted of predatory criminal sexual assault (a Class X felony) punishable at the time of his offense by a sentencing range of 6 to 30 years' imprisonment. 720 ILCS 5/12-14.1 (West 2004) (recodified as 720 ILCS 5/11-1.40 (West 2012)); 730 ILCS 5/5-8-1(a)(3) (West 2004). The defendant was also eligible for an extended term sentence up to 60 years' imprisonment because the victim was under 18 years of age (730 ILCS 5/5-5-3.2(c) (West 2004)). Furthermore, under "truth in sentencing" statutes, the defendant was required to serve at least 85% of this sentence, depending upon his conduct, while serving that sentence. See *People v. Harris*, 2012 IL App (1st) 092251, ¶ 24 (noting that the "truth-in-sentencing" statutes do "not change the sentence actually imposed ***. [Citation.] Rather, [they] determine[ ] the percentage to be actually served, which in turn depends upon the conduct of the defendant while serving that sentence.").

¶ 79　　On remand, the trial court below sentenced the 52-year-old defendant to 50 years' imprisonment. According to the IDOC website, of which we may take judicial notice (see *People v. Sanchez*, 404 Ill. App. 3d 15, 17 (2010) (finding that this court can take judicial notice of the IDOC website); see also *Buffer*, 2017 IL App (1st) 142931, ¶ 62), with time served, the defendant's earliest release (parole) date will be March 26, 2049, at which point he will be 84 years old. The defendant's actual discharge date is set for March 27, 2052, at which point he will be 88. As shall be explained further below, under our prior holdings, and contrary to the State's assertion, there can be no doubt that this sentence is equivalent to condemning the defendant to natural life imprisonment. See *Buffer*, 2017 IL App (1st) 142931, ¶ 62.

¶ 80　　We acknowledge that our supreme court has not yet defined what constitutes a *de facto* life sentence, apart from stating that this is a sentence that is "unsurvivable" and "cannot be served in one lifetime" (*Reyes*, 2016 IL 119271, ¶¶ 8-9), and that our appellate courts appear to be split on this issue,[19] and disagree as to whether it is even appropriate for a court of review to

_____

[19]The following courts have found *de facto* life sentences: *Morris*, 2017 IL App (1st) 141117, ¶ 30 (discretionary 100 years); *Nieto*, 2016 IL App (1st) 121604, ¶¶ 42-43, *pet. for leave to appeal pending*, No. 120826 (filed July 8, 2016) (discretionary 78 years); *Smolley*, 2018 IL App (3d) 150577, ¶¶ 21-22 (discretionary 65 years); *Ortiz*, 2016 IL App (1st) 133294, ¶ 24, *pet. for leave to appeal pending*, No. 121578 (filed Dec. 30, 2016) (discretionary 60 years); *Buffer*, 2017 IL App (1st) 142931, ¶¶ 62-63, *appeal allowed*, No. 122327, (Ill. Nov. 22, 2017) (discretionary 50 years); *Sanders*, 2016 IL App (1st) 121732-B, ¶¶ 25-27, *pet. for leave to appeal pending*, No. 121275 (filed Oct. 12, 2016) (discretionary sentence totaling 100 years, or "at least 49 years" with good-conduct credit). Conversely, the following courts have *not* found *de facto* life sentences: *Perez*, 2018 IL App (1st) 153629, ¶¶ 37-38 (discretionary 53 years); *Hoy*, 2017 IL App (1st) 142596, ¶ 46, *pet. for leave to appeal pending*, No. 122911 (filed May 9, 2018) (discretionary 52 years); *Jackson*, 2016 IL App (1st) 143025, ¶¶ 54-58, *pet. for leave to*

reflect on questions of biology and statistics (see *Harris*, 2016 IL App (1st) 141744, ¶ 52). Nonetheless, this exact panel has previously held that a 50-year sentence imposed on a 16-year-old juvenile was a *de facto* life sentence. *Buffer*, 2017 IL App (1st) 142931, ¶ 62. In doing so, we relied on the decision in *Sanders*, 2016 IL App (1st) 121732-B, wherein the court looked to the United States Sentencing Commission's Preliminary Quarterly Data Report, to determine the average life expectancy of a prisoner and found that a " 'person held in a general prison population has a life expectancy of about 64 years' " and that this estimate " 'probably overstate[s] the average life expectancy' " for those committed " 'to prison for lengthy terms.' " *Buffer*, 2017 IL App (1st) 142931, ¶ 59 (quoting *Sanders*, 2016 IL App (1st) 121732-B, ¶ 26). We also noted that *Sanders* quoted a study that showed that each year in prison resulted in a two-year decline in life expectancy, resulting from "high levels of violence and communicable disease, poor diets, and shoddy health care *** behind bars," and that subsequent courts have found that this "was not surprising given the harshness of a lifetime spent in a state penitentiary." (Internal quotation marks omitted.) *Id.* (quoting *Sanders*, 2016 IL App (1st) 121732-B, ¶ 26); *Harris*, 2016 IL App (1st) 141744, ¶ 53. We therefore concluded that a 50-year discretionary sentence imposed on a 16-year-old juvenile, which permitted his release on parole at the earliest at age 66, which was 2 years over his life expectancy, was the equivalent of an unconstitutional mandatory natural life sentence. See *Buffer*, 2017 IL App (1st) 142931, ¶ 64.

¶ 81        Applying the rationale of *Buffer* and *Sanders* to the facts of this case, we are compelled to conclude that the intellectually disabled defendant, whose average life expectancy is at best 64[20] but who will not be released until he is at least 84, has similarly been condemned to spend the rest of his days in prison. This "unsurvivable" sentence is equivalent to natural life imprisonment, a sentence which the original sentencing judge, who presided over the trial, heard all the evidence, and viewed all the witnesses, believed was inappropriate. See *Reyes*, 2016 IL 119271, ¶¶ 8-9.

¶ 82        Moreover, the record indicates that the trial court was not presented with current evidence of and, thus, could not have fully considered the attendant characteristics of the defendant's intellectual disability.

¶ 83        In *Holman*, our supreme court held that in determining whether an error occurred in a defendant's original sentence, a reviewing court "must look at the cold record to determine if the trial court considered [the attendant characteristics of youth] at the defendant's original sentencing hearing." *Holman*, 2017 IL 120655, ¶ 47. As the court explained, "the only evidence that matters" is the evidence at the "defendant's original sentencing hearing." *Id.* Here, however, we are not determining whether an error occurred in the defendant's original

_____

*appeal pending*, No. 121527 (filed Nov. 3, 2016) (discretionary 50 years); or *People v. Applewhite*, 2016 IL App (1st) 142330, ¶ 16, *pet. for leave to appeal pending*, No. 121901 (filed Feb. 10, 2017) (mandatory 45 years); *Evans*, 2017 IL App (1st) 143562, ¶¶ 14-18, *pet. for leave to appeal pending*, No. 122701 (filed Sept. 19, 2017) (discretionary 90-year total sentence, or 45 years with day-for-day good-conduct credit).

[20]The defendant on appeal urges us to take judicial notice of the Central Intelligence Agency's website, which states that the average life expectancy of a male in the United States is 77 years. We need not do so, however, since we may rely on our prior holdings, which refer to the more specific life expectancy of the prison population. See *Buffer*, 2017 IL App (1st) 142931, ¶ 59; *Sanders*, 2016 IL App (1st) 121732-B, ¶ 26.

sentence, since we have already determined that error did occur. Instead, we are deciding whether constitutional error occurred on resentencing. Under these circumstances, the "cold record" before us is the one from the resentencing hearing.

¶ 84    That "cold" record does not establish that the trial court had a proper opportunity to consider, much less that it did consider, the attendant characteristics of the defendant's intellectual disability and determined that the defendant was irretrievably depraved, permanently incorrigible, or irreparably corrupted beyond any possibility of rehabilitation so as to require a *de facto* life sentence. See *id.* ¶ 46.

¶ 85    In *Coty II*, we noted that it was undisputed that, at the time of the offense, the defendant was intellectually disabled with an IQ score somewhere between 55 and 65 and that, as such, under our prevailing social norms his culpability was less than that of a person with normal cognitive capacity. *Coty II*, 2014 IL App (1st) 121799-U, ¶ 66 (citing *Atkins*, 536 U.S. at 305). We further found that while we in no way diminished the seriousness of the offense, that offense included a single, brief act of penetration that did not result in any injury to the victim. *Id.* ¶ 67. In addition, we found that the encounter was an isolated event and that it was neither preplanned nor orchestrated but, rather, seemingly impulsive. *Id.* We further stated that we were troubled by the fact that the original sentencing judge, who had the benefit of observing the defendant throughout trial, had expressed reservations about imposing a life sentence under these particular circumstances. *Id.* ¶ 68. We finally noted that, despite the defendant's cognitive impairments and the brief and limited, albeit serious, nature of his offense, the defendant had nonetheless been sentenced to the harshest penalty prescribed by our laws, which our jurisprudence dictates should be reserved for the most severe offense—murder. *Id.* ¶ 69 (citing *People v. Brown*, 2012 IL App (1st) 091940, ¶ 68, and *Kennedy v. Louisiana*, 554 U.S. 407 438 (2008)).

¶ 86    Although on remand from *Coty II*, the resentencing court was in possession of the trial record created in 2006, that record was void of any information about the state of the attributes of the defendant's intellectual disability in 2016. The new PSI ordered for purposes of resentencing contained no reference whatsoever to the defendant's intellectual disability. Instead, it noted that the defendant had stated that he had never been treated by a mental health professional. In this respect, we find very troubling that the public defender did not attempt on remand to have the defendant reevaluated or to introduce any evidence that would enlighten the trial court as to whether the defendant had been receiving any special services for his disability in the last 10 years of his incarceration or whether those services had any effect. As such, the resentencing court was without an iota of evidence from which to determine whether the defendant's cognitive ability, behavior, adaptability, or ability to comprehend the consequences of his actions had changed for better or worse in the 10 years of his imprisonment. Therefore, the trial court was without the necessary facts from which to determine whether the defendant could be restored to useful citizenship or whether he was so irretrievably depraved and of such danger of recidivism that a natural life sentence was warranted. Under these circumstances and in the context of our community's clearly evolving standards of decency, we are compelled to conclude that the imposition of a 50-year *de facto* life sentence on this particular defendant, without the procedural safeguards of *Atkins*, *Miller*, and its progeny, was a penalty so wholly disproportionate that it violated the moral sense of our community. See *Gipson*, 2015 IL App (1st) 122451, ¶ 72 ("[T]he proportionate penalties clause demands consideration of the defendant's character by sentencing a defendant with the

objective of restoring the defendant to useful citizenship, an objective that is much broader than defendant's past conduct in committing the offense."). Accordingly, we find the sentence unconstitutional under the proportionate penalties clause (Ill. Const. 1970, art. I, § 11).

¶ 87　　We therefore vacate the defendant's sentence and remand for a new sentencing hearing before a different judge. On remand, we urge the public defender to have the defendant's mental health evaluated and to provide the court with as much information as possible as to the defendant's behavior and progress, or lack thereof, while in prison. We also instruct the trial court on remand to give serious consideration to the attendant characteristics of the defendant's intellectual disability and the fact that this disability "diminish[es] both [his] culpability and the need for retribution" particularly in the context of this, a nonhomicide offense. *Gipson*, 2015 IL App (1st) 122451, ¶ 74; see also *Atkins*, 536 U.S. at 320. In addition, we remind the trial court that, should it determine that there is a *bona fide* doubt of the defendant's fitness to be sentenced, it has the discretion to order a new fitness hearing to determine whether the defendant should continue to be housed in the general prison population or if he needs to be placed in a mental health facility where he can be treated for his intellectual disability before any sentence can even be imposed. 725 ILCS 5/104-11 (West 2016). Furthermore, because the defendant has already spent nearly 15 years in prison and this is the second time we are vacating his sentence, we instruct the trial court to act with the utmost expediency.

¶ 88　　　　　　　　　　　　　　III. CONCLUSION
¶ 89　　For all of the aforementioned reasons, we vacate the defendant's sentence and reverse and remand for a new sentencing hearing, with instructions.

¶ 90　　Sentence vacated.
¶ 91　　Reversed and remanded with instructions.