2021 IL App (1st) 192289

No. 1-19-2289

Opinion filed May 19, 2021

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 08 CR18483 |
| | ) | |
| KEVIN ROBINSON, | ) | Honorable |
| | ) | Angela Petrone, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial in 2012, defendant was found guilty of aggravated kidnapping and aggravated criminal sexual assault. The trial court sentenced defendant, who was 24 years old at the time of the offense, to a statutorily mandated term of natural life imprisonment for the aggravated criminal sexual assault conviction based on a prior conviction for criminal sexual assault and a concurrent term of 20 years' imprisonment for the aggravated kidnapping conviction. In his first direct appeal, we reversed his conviction for aggravated kidnapping, affirmed the

aggravated criminal sexual assault conviction, and remanded for resentencing. *People v. Robinson*, 2016 IL App (1st) 130484, ¶¶ 55, 57-58.

¶ 2        On remand, defendant argued before the trial court that his life sentence, mandated under the former section 12-14(d)(2) of the Criminal Code of 1961 (720 ILCS 5/12-14(d)(2) (West 2008) (recodified as 720 ILCS 5/11-1.30(d)(2))), is unconstitutional as applied to him based on his mental illnesses as it violates his rights under the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). He developed a significant factual record in the trial court in support of his claim. The trial court rejected this claim and again sentenced him to natural life imprisonment.

¶ 3        On appeal, defendant raises the same constitutional issues. For the reasons that follow, we hold that defendant's mandatory life sentence does not violate the eighth amendment or the proportionate penalties clause because he was an adult at the time he committed the aggravated criminal sexual assault and he failed to show that the protections outlined in *Miller v. Alabama*, 567 U.S. 460 (2012), should extend to him based on his mental illnesses. Also, despite the mandatory nature of the sentencing statute, the trial court nevertheless considered the relevant factors regarding defendant's upbringing, mental illnesses, culpability, future dangerousness, and rehabilitative potential before imposing the sentence. Accordingly, we affirm the judgment of the circuit court.

¶ 4                                        I. BACKGROUND

¶ 5        We previously set forth the facts from defendant's trial in *Robinson*, 2016 IL App (1st) 130484, and discuss them briefly here only to the extent necessary. The evidence showed that in September 2008, defendant met the 25-year-old female victim, B.H., who had developmental

delays, for the first time at the mall through mutual friends. They exchanged phone numbers, and he later called the victim around midnight and invited her out to eat and to the movies. Once defendant and the victim were alone together on the Chicago Transit Authority (CTA) Red Line, he persuaded her to exit the train and enter a dark, boarded-up house at approximately 2 a.m. under the pretext that he and a friend wanted to buy the property and his friend wanted him to "go check this property out." Once inside the house, defendant pushed her against the wall and began kissing her. When she told him not to do this, he pushed her to the ground, slapped her, and told her to stop screaming. He then forcibly raped B.H. and made her clean herself off with her hand afterwards. He warned her not to tell anyone because he knew where she lived. *Id*. ¶¶ 4-10. Defendant later called, and she testified that he warned her, " 'if I have told anybody or anything, he knows where I stay at and he will come get me.' " *Id*. ¶ 12. As soon as B.H. was away from the defendant and on a bus back to her house, she called her mother and asked her to meet her at the bus station, where she informed her mother that she had been raped. They called 911, and she was taken to the hospital where a sexual evidence kit was obtained. There was a human male DNA profile identified from the rectum swabs of the victim that matched defendant's DNA profile. B.H. identified defendant in a photographic lineup the next day. *Id.* ¶¶ 11, 17-18.

¶ 6        At trial, the State also presented other acts evidence of a 2002 incident where defendant met a 16-year-old female, D.H., on a CTA train, engaged her in conversation, and got her phone number. Defendant later called around midnight and invited her to hang out at an "El" station where he was with a friend. After D.H. arrived and was alone with defendant in the sitting area of a bathroom inside the station, defendant asked his friend to lock the door from the outside. Defendant then forcibly raped D.H. He later told his friend that he " 'did something bad to [his] friend.' " *Id.* ¶ 19.

¶ 7        Following his convictions in the instant case, the trial court sentenced defendant to statutorily mandated natural life imprisonment for the aggravated criminal sexual assault conviction based upon his prior conviction for criminal sexual assault from May 2003 and a concurrent term of 20 years' imprisonment for the aggravated kidnapping conviction. *Id.* ¶¶ 20-22.

¶ 8        In his first direct appeal, defendant argued that (1) there was insufficient evidence supporting his conviction of aggravated kidnapping and (2) the jury was given an erroneous instruction where the aggravated kidnapping instruction was predicated on a confinement theory but the charges in the indictment and the kidnapping instruction were predicated on an inducement theory. *Id.* ¶¶ 25, 37. This court found sufficient evidence to support his conviction of aggravated kidnapping. *Id.* ¶ 35. However, we found the jury was improperly instructed on aggravated kidnapping and that this established plain error requiring reversal under the second prong of the plain error test. *Id.* ¶ 55. We therefore reversed his conviction for aggravated kidnapping, affirmed his conviction for aggravated sexual assault (predicated on kidnapping, which the jury was properly instructed on), and remanded for resentencing. *Id.* ¶¶ 55, 57.

¶ 9                                    A. Remand for Resentencing

¶ 10        On remand, the trial court held a series of hearings for the parties to present argument and evidence pertinent to resentencing defendant for the aggravated criminal sexual assault conviction.

¶ 11        At a hearing on April 16, 2019, the State reiterated the facts presented at trial surrounding the aggravated criminal sexual assault in this case and the other-acts evidence. The State asserted that because defendant was previously convicted of criminal sexual assault, a sentence of natural life imprisonment must be imposed pursuant to the former section 12-14 (d)(2) of the Criminal Code of 1961 (720 ILCS 5/12-14(d)(2) (West 2008)).

¶ 12    Defense counsel argued that the sentencing statute (*id.*) requiring a natural life sentence was unconstitutional as applied to defendant under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) based on the reasoning outlined in *Miller*, 567 U.S. at 479 (finding a mandatory sentence of life imprisonment without parole to be unconstitutional when imposed on a juvenile convicted of homicide), and *People v. Coty*, 2018 IL App (1st) 162383 (applying *Miller* to a defendant with intellectual disabilities), *rev'd*, 2020 IL 123972,[1] considering his life-long mental illnesses and difficult childhood.

¶ 13    In support, defense counsel presented defendant's records from the Department of Children and Family Services (DCFS), the Chicago Public Schools (CPS), and presentence investigation report (PSI). Counsel asserted that defendant's records showed that defendant was born to a teenage mother who was at the time a ward of DCFS and who suffered from mental illnesses, that defendant was placed in foster care as an infant and experienced the deaths of three different foster mothers, and that defendant eventually lived in various group homes. Defendant reported experiencing physical, sexual, and emotional abuse in the foster homes. He also received in-patient treatment three different times at mental health facilities. Defense counsel argued that defendant exhibited serious behavioral and emotional problems at school, received special services, and dropped out after one year of high school. After that, he was receiving no treatment or support of any kind, and by the age of 18 he was arrested for the first criminal sexual assault. Counsel argued that the forensic report from 2003 indicated defendant was not taking any medications and had attempted suicide in jail, and he was found fit to stand trial with medication. He pleaded guilty and

---

[1]While defendant's appeal was pending, our supreme court reversed *Coty* and found that a mandatory natural life sentence for an intellectually disabled repeat sex offender did not violate the proportionate penalties clause or eighth amendment. *People v. Coty*, 2020 IL 123972, ¶¶ 42, 45-46.

served six years in prison, being released in 2008. Counsel argued that following his release, he was not receiving any treatment or mandated to be on any medications, and then he was arrested for the instant case when he was 24 years old. Following his arrest, he was evaluated and placed on antipsychotic and antidepressant medications for bipolar disorder and depression.

¶ 14 The trial court indicated that it wanted to see defendant's records from the Illinois Department of Corrections (IDOC) records and continued the hearing until the records were provided.

¶ 15 We note that a secured record on appeal contains numerous documents provided by defendant in the trial court related to his claim that he suffered from life-long mental illnesses. The records date back to 1986, when defendant was a child, and include psychological evaluations, intake studies with DCFS, mental health assessments, and assessments and evaluations from CPS. In addition, the record contains the three fitness evaluations that were performed on defendant during the course of trial proceedings. In March 2010, Dr. Susan Messina, a forensic psychologist with Forensic Clinical Services issued a report finding defendant fit for trial and legally sane at the time of the offense against B.H., that he understood the charges against him and courtroom procedure, and that he was receiving psychotropic medication that staff would assist with. Dr. Messina found nothing from what she reviewed that suggested a "prominent mental illness or defect" that precluded defendant from being able to appreciate the criminality of his conduct at the time of the offense. In April 2010, Dr. Jonathan Kelly with Forensic Clinical Services issued a report also finding defendant fit for trial, observing that he understood the charges against him and was able to assist in his defense. Further, defendant was being prescribed antipsychotic medication, mood-stabilizing medication, antidepressant medication, and medication for side effects (risperidone, divalproex, Prozac, and benztropine). Dr. Kelly also opined that defendant was

legally sane at the time of the offense, finding that he "did not have a mental disease or defect at that time that caused him to lack substantial capacity to appreciate the criminality of his conduct." In August 2011, Dr. Christofer Cooper, also a forensic psychologist with Forensic Clinical Services, issued a report finding defendant fit to stand trial and legally sane at the time of the offense, noting that he was taking psychotropic medication but was not suffering from a mental disease or defect that cause him to lack substantial capacity to appreciate the criminality of his conduct.

¶ 16                                    B. Sentencing Hearing on August 12, 2019

¶ 17        At a hearing on August 12, 2019, the trial court noted that it had received reports from CPS, DCFS, and IDOC and also had defendant's PSI. The trial court then extensively reviewed the evidence presented at defendant's trial, noting that it "remember[ed] the facts of the case very well," including its observations of the victim of the current sexual assault and the woman who testified about defendant's prior sexual assault. The court observed that, due to defendant's prior conviction of criminal sexual assault, defendant must be sentenced to a term of natural life in the present case, but it "wanted to look at all the information here as well."

¶ 18        The trial court then comprehensively reviewed the information provided by defense counsel regarding defendant's upbringing, education, criminal history, mental illnesses, and behavior during incarceration. The trial court summarized that, regarding his DCFS records, defendant entered foster care as an infant, he exhibited hyperactive behavior by the age of two, and he was prescribed Ritalin. The court noted that as defendant grew older, he showed difficulty following the rules and required close supervision, he was considered "extremely hyperactive," engaged in dangerous behavior, and was "rough and likes to fight with other children." One foster mother reported that "when you turn your back on him you never know what to expect." The court

observed that DCFS records showed defendant "got along fairly well" at school, but he liked to fight with classmates; he was "oriented as to person, time, and place" but had "borderline mental development range, sometimes takes risks and does dangerous things." Defendant was "hyperactive and a difficult child to manage," and he "felt rejected by his birth mother." The trial court further observed that defendant was diagnosed at 13 years old with attention deficient hyperactivity disorder (ADHD) and prescribed Ritalin and Prozac. He denied auditory or visual hallucinations and "appeared to be both happy, sad, and angry."

¶ 19    The trial court observed that as defendant got older, he had chronic ADHD and emotional and behavioral problems, though he was not homicidal or suicidal. Further, defendant was diagnosed with oppositional defiant disorder and bipolar disorder, and he was prescribed Risperdal and Prozac. He engaged in self-harm behaviors and exhibited poor impulse control, aggression, impaired judgment, and risky behavior.

¶ 20    The trial court also reviewed defendant's CPS school records and noted that, on one hand, defendant was articulate, resourceful, and good with his hands and "loves to go to church." On the other, he was confrontational with authority, often reprimanded for being noncompliant, refused to follow rules, exhibited increasingly volatile behavior, had several suspensions, was belligerent towards his classmates and staff, disrespectful towards authority figures, and had physical and verbal altercations with peers. Defendant refused to remain in school an entire day. He was noncompliant with his medication and refused to participate in counseling sessions.

¶ 21    In reviewing defendant's IDOC records, the trial court observed that defendant had approximately 50 incidents where he received tickets or citations from IDOC for intimidation, threats, unauthorized movement, insolence, disobeying a direct order, assaulting staff and other inmates, and an incident where defendant filed a grievance because he was denied a comic book

that contained graphic sexual images. He was charged with assaulting an inmate with an extension cord and assaulting a staff member. The trial court noted that defendant threatened to hit his assistant public defender during trial; when the court told him not to say that, defendant said it again. The trial court also noted that defendant was previously convicted of aggravated battery to a peace officer and had another pending charge against him for the same, in addition to the prior criminal sexual assault.

¶ 22        The trial court also related that, according to his PSI, defendant had one child and saw her regularly before his arrest. He completed one year of high school and worked as a day laborer and at a fast-food restaurant. Defendant reported experiencing blackouts and concussions, that he had been treated on an in-patient basis at three hospitals, and that he had attempted suicide several times.

¶ 23        Considering all of this information, the trial court observed that defendant's childhood "was not of his own making that his mother had him at a very young age, was put in foster homes, and he did experience the loss of his mother, I find that to be very sad and tragic." The trial court indicated that it searched for some improvement in his behavior since it sentenced him in January 2013, "[b]ut sadly I haven't found any improvement. I haven't found any time where he went to improve his education or he took any courses to improve himself." In mitigation, the trial court found that "defendant did not create the circumstances of his childhood or living situation. He did report that at some time he was employed and that he has regained contact with his daughter which is also very good." However, there was "a lot of inappropriate behavior still in prison." The trial court stated that it was statutorily mandated to sentence defendant to natural life in prison due to his prior conviction for criminal sexual assault.

¶ 24    Defense counsel argued that the mandatory life sentence was unconstitutional. The trial court responded, "[t]hat's one of the reasons why I wanted to look at all the records because I know that you're saying mandated natural life without parole is unconstitutional." Instead of "automatically sentencing him to life," the trial court stated that it was:

> "really was looking for some information to show that Mr. Robinson had turned his life around or tried to or worked on his aggression, particularly his aggression towards females possibly because of his relationship with his mother and his feelings of abandonment in order to consider that with your request to consider the statute unconstitutional. I'm not at this time willing to find the statute unconstitutional and I'm not willing to find Mr. Robinson has shown me any change in his behavior or any attempts at recognizing his aggression and how to—deal with it so he is sentenced to natural life without the possibility of parole."

¶ 25                          C. Motion to Reconsider Sentence

¶ 26    Defendant filed a motion to reconsider sentence on September 9, 2019, again urging the court to find the sentencing statute unconstitutional as applied to him.

¶ 27    The trial court entered a written order on October 8, 2019, denying the motion for resentencing. The trial court found that because defendant was 24 years old at the time he committed the sexual assault in this case, *Miller* did not apply to him. The trial court also rejected defendant's argument that *Miller* should apply to him as it did to the intellectually disabled defendant in *Coty*, 2018 IL App (1st) 162383, finding that defendant was not "intellectually disabled" like the defendant in *Coty*. The trial court indicated that, before trial, defendant was

found fit to stand trial and legally sane at the time of the offense on three separate occasions by three different forensic psychologists or psychiatrists with Forensic Clinical Services.

¶ 28       Also in its written order, the trial court observed that defendant "frequently and coherently articulated concerns" to the court such as requesting that his counsel obtain certain evidence and asking to the court to place him in protective custody in the jail. Defendant had complained of blackouts during jury selection, but the court observed he was engaging his with attorneys and taking notes and his attorneys indicated he was fit for trial and specifically requested that another fitness examination not be done, and instead screened for medication issues. In posttrial motions, defendant's counsel indicated that defendant was alert, oriented as to time and place, fit to stand trial, articulate, responsive, cooperative, and engaged.

¶ 29       In addition, the trial court found in its written order that defendant's allegation that he had "diminished culpability" due to "his untreated mental illness" was not supported by the records defendant provided. The trial court again reviewed the information presented in these records, including the circumstances of his birth and upbringing, his school records, his employment history, his involvement in his daughter's life, his treatment in three mental hospitals, his diagnosis with "PTSD, ADHD, bi-polar, anti-social and insomnia," and that he took Ritalin, Prozac, albuterol, trazodone, Zoloft, risperidone, and Benadryl. The trial court reiterated that his IDOC records failed to show "any efforts towards rehabilitation" or efforts to continue his education, such as obtaining a GED or participating in classes for anger management or sex offender counseling or treatment. Further, the IDOC records showed approximately 50 incidents where defendant was cited for violent and threatening conduct and he attempted to order magazines with graphic sexual images. The trial court reiterated that defendant threatened to hit his defense attorney during trial and stated that he had a "homicidal type of attitude toward her." Additionally,

the trial court observed that defendant's actions in the present case and in the other-crimes case "did not appear impulsive, but to be premeditated, planned attacks on two separate occasions." The trial court found that it sentenced defendant as it did because he failed to show "any change in his behavior or any attempt at recognizing his aggression and how to deal with it *** I was looking for, hopefully, improvements in his IDOC records since I sentenced him to natural life back in January of 2013. But, sadly, I haven't found any improvement. I haven't found any time where he went to improve his education or took any courses to improve himself." The trial court stated that it followed the statute mandating the life sentence but added:

> "this court did not automatically resentence defendant to life, but gave whatever time was needed to obtain any additional information to consider in resentencing; and considered not only evidence from trial, but defendant's behavior since being incarcerated and information about him from before trial. This included all of the information listed above. This court believes that all appropriate factors in aggravation and mitigation were considered, and that the sentence imposed was appropriate."

¶ 30    Defendant filed a timely notice of appeal.

¶ 31                               II. ANALYSIS

¶ 32              A. State's Arguments Regarding the Record on Appeal and Forfeiture

¶ 33    Before we address defendant's constitutional challenges to his sentence, we first turn to the State's arguments that (1) we should affirm the sentence because defendant failed to file the full record on appeal, and (2) defendant's claims based on bipolar disorder, PTSD, antisocial personality disorder, and insomnia are forfeited because he could have raised them in his first direct appeal.

¶ 34　　　　We acknowledge that defendant, "as the appellant, bears the burden of providing a sufficiently complete record to support its claims of error." *People v. Collins*, 2021 IL App (1st) 170597, ¶ 37 (citing *People v. Smith*, 406 Ill. App. 3d 879, 886 (2010); *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)). The State contends that defendant failed to provide this court with the transcripts from his trial. However, we do not find this a sufficient reason to simply affirm defendant's sentence and deny his appeal in the present case. This court previously reviewed the trial transcripts extensively and set forth a detailed account of the facts of this case as presented in his jury trial. See *Robinson*, 2016 IL App (1st) 130484, ¶¶ 3-22. The record contains the lower court record involved in the remand, his sentencing transcript, and the records provided by defense counsel in resentencing. To the extent we find any deficiency, we note that "[a]ny doubt arising from the incompleteness of the record will be construed against defendant." *Collins*, 2021 IL App (1st) 170597, ¶ 37.

¶ 35　　　　The State contends that defendant forfeited certain claims for failure to raise them in his first appeal. The rule is clear that issues that could have been raised in an initial appeal, but were not, cannot be raised in a second direct appeal. See *Kazubowski v. Kazubowski*, 45 Ill. 2d 405, 414 (1970); *People v. Johnson*, 352 Ill. App. 3d 442, 448 (2004) (noting that issues not raised in a first direct appeal are procedurally barred in a second direct appeal after remand). Issues that were not raised in the first appeal are considered forfeited, and the second appeal "brings up nothing except proceedings subsequent to the remandment for the reason that a party will not be permitted to have his cause heard part at one time and the residue at another." *Kazubowski*, 45 Ill. 2d at 414.

¶ 36　　　　However, we note that defendant was initially sentenced just after *Miller* was decided by the United States Supreme Court and three years before *Coty* was decided by our appellate court, and his first direct appeal was decided two years before *Coty*. Moreover, because defendant raised

the issue on remand, extensive evidence was presented at various hearings regarding his as-applied constitutional challenge. Thus, "the record has been developed sufficiently to address the defendant's constitutional claim," and we are not forced to assess his as-applied challenge in a "factual vacuum." *People v. Harris*, 2018 IL 121932, ¶ 41. Moreover, "a defendant may argue that a criminal statute is unconstitutional and void at any time." *People v. Lampkins*, 2015 IL App (1st) 123519, ¶ 9. As the forfeiture rule "is a limitation on the parties and not the court," we will not enforce a procedural default on this issue. *People v. Sophanavong*, 2020 IL 124337, ¶ 21.

¶ 37                           B. Defendant's Constitutional Challenges

¶ 38          On appeal, defendant contends that his statutorily mandated natural life sentence pursuant to the former section 12-14(d)(2) of the Criminal Code of 1961 (720 ILCS 12-14(d)(2) (West 2008) (recodified as 720 ILCS 5/11-1.30(d)(2))) violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) as applied to him. Defendant urges that his documented, life-long mental illnesses demonstrate a diminished criminal culpability and a greater capacity for rehabilitation because his conditions are treatable.

¶ 39          We begin by observing that a statute is presumed constitutional, and we must therefore construe it to uphold its validity when reasonably possible; the party challenging the statute bears the burden of demonstrating its invalidity. *People v. Huddleston*, 212 Ill. 2d 107, 128-29 (2004). We review a circuit court's determination regarding the constitutional validity of a statute *de novo*. *Id.* at 129. "A defendant who has an adequate opportunity to present evidence in support of an as-applied, constitutional claim will have his claim adjudged on the record he presents." *People v. Coty*, 2020 IL 123972, ¶ 22.

¶ 40                                    1. Eighth Amendment

¶ 41　　　　The eighth amendment's prohibition of "cruel and unusual punishment[ ]" applies to the states through the fourteenth amendment. U.S. Const., amends. VIII, XIV; *People v. Davis*, 2014 IL 115595, ¶ 18. In *Miller*, the United States Supreme Court held that mandatory life sentences imposed on juvenile offenders (under 18 years of age at the time of the offense) violate the eighth amendment because this prevents the sentencing court from considering the mitigating aspects of youth, *i.e.*, their immaturity, impulsivity, and increased vulnerability to negative influences. 567 U.S. at 471-80.

¶ 42　　　　The Illinois Supreme Court has since determined that *Miller* applies to mandatory, discretionary, natural, or *de facto* life sentences imposed on juveniles. *People v. Holman*, 2017 IL 120655, ¶¶ 40, 46; *People v. Reyes*, 2016 IL 119271, ¶ 9. It also drew the line for a *de facto* life sentence at 40 years. *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41. Accordingly, "to prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Id.* ¶ 27 (citing *Holman*, 2017 IL 120655, ¶ 40; *Reyes*, 2016 IL 119271, ¶ 9).[2]

¶ 43　　　　Here, however, it is undisputed that defendant was 24 years old at the time he committed the aggravated criminal sexual assault at issue. "By now, it is clear that the categorical findings made by *Miller* and its progeny under the federal eighth amendment apply only to juveniles." *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 28 (collecting cases and stating that the 19-year-

---

[2]Such attendant characteristics of youth include (1) the juvenile's age at the time of the offense and evidence of his immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile's family and home environment; (3) the juvenile's degree of participation in the offense and the presence of any pressures affecting him; (4) the juvenile's incompetence or inability to deal with the police or his attorney; (5) the juvenile's prospects for rehabilitation. *Holman*, 2017 IL 120655, ¶ 46.

old defendant "cannot avail himself of the eighth amendment" under *Miller*). "[C]laims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected." *Harris*, 2018 IL 121932, ¶ 61. "It is well established that offenders who are 18 years and older cannot raise a facial challenge to their sentences under the eighth amendment and the *Miller* line of cases." *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 49.

¶ 44    Defendant therefore cannot avail himself of *Miller* under the eighth amendment. We note that defendant contends that his eighth amendment challenge is also supported by *Coty*, 2020 IL 123972, where the 46-year-old defendant argued that his intellectual disability should be treated similarly to juveniles in sentencing. However, the supreme court decided *Coty* under the proportionate penalties clause of the Illinois Constitution, not the eighth amendment, and is therefore not helpful to defendant's eighth amendment challenge here. See *id.* ¶¶ 36-40. Defendant's challenge based on *Coty* and *Miller* is more appropriately considered under the proportionate penalties clause.

¶ 45                            2. Proportionate Penalties Clause

¶ 46    The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our courts have construed the clause to extend greater protections against excessive punishment than the eighth amendment. *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63. A defendant's sentence violates the proportionate penalties clause where "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). To comply with this provision, the court must balance the goals of retribution and rehabilitation, carefully considering all factors in aggravation and mitigation. *People v. Quintana*,

332 Ill. App. 3d 96, 109 (2002). "To determine whether a penalty shocks the moral sense of the community, we must consider objective evidence as well as the community's changing standard of moral decency." *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 47     Our courts have recently expanded *Miller* to apply to non-juveniles.

[O]ur supreme court has twice acknowledged that young adults—at least those who were 20 years of age or younger at the time of their crimes—may still rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support as-applied challenges to life sentences brought pursuant to the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11)." *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25 (citing *People v. Thompson*, 2015 IL 118151, ¶ 44 (19-year-old defendant was "not necessarily foreclosed" from raising claim in postconviction proceedings that sentence was unconstitutional as applied to him), and *Harris*, 2018 IL 121932, ¶ 48 (as-applied, youth-based sentencing claim of 18-year-old defendant was "more appropriately raised" in postconviction proceedings where a factual record could be developed)).

See also *People v. Evans*, 2021 IL App (1st) 172809, ¶ 16 (our supreme court has "opened the door for young adult offenders to demonstrate that their own specific characteristics at the time of their offense were so like those of a juvenile that the imposition of a life sentence, absent the safeguards established in *Miller*, violates the proportionate penalties clause"); *Franklin*, 2020 IL App (1st) 171628, ¶ 51 ("Illinois courts typically consider the sentencing claims of young adults under the proportionate penalties clause rather than the eighth amendment").

¶ 48     However, as stated, defendant was 24 years old at the time he committed the aggravated criminal sexual assault, which is well past both the juvenile cutoff for eighth amendment *Miller*-based claims and the 18-to-21-year-old group of defendants who have asserted as-applied *Miller*-

based claims under the proportionate penalties clause. See *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 27 (observing that the *Miller*-based protections "were applied to under-18-year-olds and which have been arguably extended in some cases and statutes to under-21-year-olds"). Defendant fails to cite any authority where an offender who was 24 years old at the time of the offense received the special considerations set forth in *Miller*. "[Defendant] can point to no case in which an Illinois court has recognized that a life sentence imposed on a young adult—21 or older as [defendant] was—is unconstitutional as applied to that offender under the proportionate penalties clause or the eighth amendment." *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 33. "The evolving science on brain development may support such claims at some time in the future, but for now individuals who are 21 years or older when they commit an offense are adults for purposes of a *Miller* claim." *Id.* "While 21 is undoubtedly somewhat arbitrary, drawing a line there is in keeping with other aspects of criminal law and society's current general recognition that 21 is considered the beginning of adulthood." *Id.* ¶ 34.

¶ 49 Defendant nevertheless argues that *Miller* should be expanded to apply to him under similar logic—not based necessarily on age but due to mental illness. He argues that he has a long-documented history of severe mental illnesses that were untreated at the time of the offense and this reduced his culpability because, like a juvenile offender, they impacted his ability to understand consequences, control impulses, logically reason, and communicate with others. He asserts that he experienced a difficult childhood, was subjected to abuse, and received little to no treatment or medication for his mental illnesses. He also contends that similar to the maturation of youths, he has significant potential for rehabilitation because his mental illnesses are treatable. Due to the mandatory sentencing statute, he argues that these attributes were not considered by the

trial court in sentencing him, in violation of the principles of *Miller* and the proportionate penalties clause.

¶ 50    Defendant reasons that the principles outlined in *Coty*, 2020 IL 123972, following *Miller*, support his argument that his statutorily mandated life sentence is unconstitutional as applied to him. As previously explained, *Coty*, 2018 IL App (1st) 162383, extended the protections of *Miller* to an intellectually disabled 46-year-old defendant who received a life sentence for his conviction of predatory criminal sexual assault of a child, after having been convicted of, *inter alia*, aggravated criminal sexual assault. The appellate court reasoned that *Miller* was based on *Atkins v. Virginia*, 536 U.S. 304 (2002), which found that the eighth amendment barred execution of mentally disabled defendants because the disability diminished their culpability. *Coty*, 2018 IL App (1st) 162383, ¶¶ 69-77. The *Atkins* court identified the following factors to weigh in sentencing an intellectually disabled defendant to execution: "diminished capacity (1) to understand and process information, (2) to communicate, (3) to abstract from mistakes and learn from experience, (4) to engage in logical reasoning, (5) to control impulses, and (6) to understand others' actions and reactions, so as to be more susceptible to manipulation and pressure." *Coty*, 2018 IL App (1st) 162383 (citing *Atkins*, 536 U.S. at 318).

¶ 51    However, while defendant's appeal in the instant case was pending, our supreme court reversed *Coty*, noting that

> "the question presented in this case is whether a sentence of life imprisonment, mandatory or *de facto*, is permissible for this intellectually disabled adult twice convicted of a sexual offense perpetrated upon a young child and, if the statute requiring a mandatory natural life sentence does not apply, whether and to what extent *Atkins* factors must be considered prior to the imposition of a *de facto* life sentence." *People v. Coty*, 2020 IL 123972, ¶ 19.

The court found the mandatory life sentence imposed on the intellectually disabled defendant did not violate the proportionate penalties clause as applied to him. *Id.* ¶ 44.

¶ 52       In so holding, the supreme court in *Coty* reasoned that it had previously "upheld the constitutionality" of section 12-14.1(b)(2)'s mandatory-life sentencing provision against an as-applied proportionate penalties challenge in *Huddleston*, 212 Ill. 2d 107. *Coty*, 2020 IL 123972, ¶ 23. The court observed that it has "repeatedly recognized that the legislature has the power to prescribe penalties for defined offenses, and that power necessarily includes the authority to prescribe mandatory sentences, even if such sentences restrict the judiciary's discretion in imposing sentences." *Id.* ¶ 24 (citing *Huddleston*, 212 Ill. 2d at 129). It further noted that "there is no indication [in our constitution] that the possibility of rehabilitating an offender was to be given greater weight and consideration than the seriousness of the offense in determining a proper penalty." (Internal quotation marks omitted.) *Id.* "Factors to be considered in determining the seriousness of an offense include the degree of harm, the frequency of the crime, and the risk of bodily injury associated with it." (Internal quotation marks omitted.) *Id.* The *Coty* court observed that, in *Huddleston*, the court emphasized the profound impact sexual assault can have on children and the high rate of recidivism among sex offenders; as such, the statutorily mandated natural life sentence in *Huddleston* did not violate the proportionate penalties clause as applied to that defendant. *Id.* ¶¶ 25-31.

¶ 53       As to the intellectually disabled defendant in *Coty*, the court examined three factors that could potentially differentiate him from the defendant in *Huddleston*: culpability, future dangerousness, and rehabilitative potential. *Id.* ¶ 32. The court took "as a given the characteristics of the intellectually disabled" as set forth in *Atkins*, but noted that subjecting a defendant to execution was a very different issue than imposing a life sentence. *Id.* ¶ 33. Although an

intellectual disability could reduce a defendant's culpability, the court found that it may also increase a defendant's future dangerousness. *Id.* ¶¶ 34-38. This was so especially in the context of sexual offenders.

> "Sexual recidivism, and the future dangerousness it entails, was obviously a factor in the legislature's determination that a natural life sentence is warranted for recidivists. With respect to this intellectually disabled defendant, we note that some of the very factors that the Court in *Atkins* found *reduced culpability* \*\*\* are what make him *a continuing danger to reoffend*." (Emphases in original.) *Id.* ¶ 36.

¶ 54    Turning to the prospects for rehabilitation in its proportionate penalties clause analysis, the court noted that, in *Huddleston*, the defendant had no intellectual deficits, but "this court concluded that defendant's rehabilitative potential did not outweigh the legislature's determination as to the seriousness of repeated sexual offenses and the need for a mandatory natural life sentence." *Id.* ¶ 37. In distinction, with regard to the intellectually disabled defendant in *Coty*, "[t]he factors identified in *Atkins* logically impair rehabilitative potential, and, unlike a juvenile, whose mental development and maturation will eventually increase that potential, the same cannot generally be said of the intellectually disabled over time." *Id.* The court found that the reduced culpability of youth was distinguishable from the lessened culpability of the intellectually disabled on grounds that *Miller* was based on "the *transient* characteristics of youth, characteristics not shared by adults who are intellectually disabled." (Emphasis in original.) *Id.* ¶ 39. Given the static nature of an intellectual disability, the court found a reduced probability of rehabilitation. *Id.* ¶¶ 37-40. Having found that the defendant's life sentence did not violate the proportionate penalties clause, the court also concluded that "if a sentence passes muster under the proportionate penalties clause, \*\*\* then it would seem to comport with the contemporary standards of the eighth amendment." *Id.* ¶ 45. As

the *Coty* court observed, "[c]ourts across the country that have addressed the issue \*\*\* have declined to extend *Atkins* to noncapital sentences or *Miller* to the intellectually disabled." (Internal quotation marks omitted.) *Id.* Accordingly, we believe that "the 'moral judgment' and 'mores' of the nation are not inconsistent with our own in this matter." *Id.*

¶ 55      Defendant argues that the principles informing our supreme court's analysis in *Coty* and the United States Supreme Court's analysis in *Miller* are helpful to him here in that, like the attendant characteristics of youth, the court must consider his mental illnesses as a mitigating factor that indicates lessened culpability for his offense and increased possibility for rehabilitation because his illnesses are treatable. We note that "[y]oung adult offenders are not *entitled* to the presumption that the tenets of *Miller* apply to them pursuant to the proportionate penalties clause. [Citation.] Indeed, they must *establish a record* to support their argument \*\*\*." (Emphases in original.) *Evans*, 2021 IL App (1st) 172809, ¶ 19. Here, defendant raised his as-applied challenge in the trial court and presented extensive documentation and argument; as such, a factual record was developed related to his claim.

¶ 56      The record does indeed demonstrate defendant's long-term struggles with behavioral problems, complying with rules, engaging in dangerous, threatening, volatile, and violent behavior, and mental illnesses—bipolar disorder, PTSD, depression, antisocial personality disorder, and insomnia. However, the same characteristics of his mental illnesses that he argues reduced his culpability also suggest increased future dangerousness. Defendant has not shown how they rendered him less culpable for sexually assaulting B.H. than a typical adult sex offender. In that regard, it bears mentioning that defendant was the sole perpetrator of the sexual assault. In fact, as the trial court noted, the trial evidence demonstrated defendant's premeditated conduct in perpetrating the offense. When defendant first met B.H., who showed apparent signs of

developmental delays, he obtained her phone number and called her late at night, inviting her to dinner and a movie despite the obvious late hour. He then lured her through deceit to an abandoned building, where he perpetrated the sexual assault. The prior acts evidence showed that defendant had engaged in similar behavior previously in luring another woman to an empty CTA restroom late at night before sexually assaulting her. We also note that defendant underwent a fitness evaluation three times during the course of the criminal proceedings, and each time he was found fit to stand trial and legally sane at the time of the offense and aware of his actions.

¶ 57   Similar to the defendant in *Coty*, we find no reason hold that the existence of his mental illnesses is an inherently mitigating factor such that application of the mandatory life sentence would violate the proportionate penalties clause. Our supreme court has "repeatedly held that evidence of a defendant's mental or psychological impairments may not be inherently mitigating, or may not be mitigating enough to overcome the evidence in aggravation." *People v. Thompson*, 222 Ill. 2d 1, 42-43 (2006) (the defendant had paranoid and antisocial personality disorder). Indeed, a diagnosis of antisocial personality disorder can also indicate a defendant's future dangerousness, making it an aggravating factor. See *id.* at 43; *People v. Thomas*, 178 Ill. 2d 215, 244 (1997) (evidence that the defendant had antisocial personality disorder constituted evidence in aggravation in a death-penalty case); *People v. Macri*, 185 Ill. 2d 1, 66-67 (1998) (prosecutor properly asserted in aggravation that the defendant's antisocial personality disorder showed his violent nature); *People v. Christiansen*, 116 Ill. 2d 96, 129 (1987) (death penalty appropriate despite mitigating evidence of emotional and mental disturbance, alcoholism, drug addiction, poor health, deprived childhood, and remorse).

¶ 58   Also similar to the defendant in *Coty*, nothing in the records that defendant presented provided any basis for finding that defendant had an increased possibility for rehabilitation because

his mental health conditions are "treatable." Although defendant received treatment in the form of medication and counseling through DCFS and CPS as a youth, there was no evidence that this adequately controlled his mental illnesses or reduced his tendency to defy authority and engage in violent behavior. There was evidence of defendant's unwillingness to comply with treatment and medication even as a child. As further testament to his lack of rehabilitative potential, defendant committed the instant sexual assault shortly after being released from prison after serving his sentence for his prior sexual assault conviction. In reviewing defendant's IDOC records, it is apparent that the trial court was hoping to find evidence of rehabilitative potential, *i.e.*, that defendant had used his time in prison to seek treatment for his mental illnesses or as a sexual offender or further his education. Instead, the stark reality is that the trial court found the opposite—defendant had approximately 50 citations for threatening, violent, assaultive, disruptive, or noncompliant behavior while in prison; defendant continued to exhibit disparaging behavior towards female staff; and defendant filed a grievance when he was denied a comic book that contained graphic sexual images. This was despite being in prison following his conviction for the instant offense and presumably having access to treatments and medications for his mental illnesses.

¶ 59       Defendant also argues that, in resentencing him, the trial court considered only a portion of defendant's IDOC records, which was "insufficient to paint a full and complete picture of Mr. Robinson's rehabilitative potential," and the trial court sentenced him based solely the mandatory statute.

¶ 60       Our review of the record reveals that this is an inaccurate characterization of the trial court's actions. Upon remand for resentencing following defendant's first appeal, the trial court went to great lengths to allow defendant additional time to obtain various records related to his

upbringing, school records, mental health records, and his IDOC records to support his claim regarding the unconstitutionality of the sentencing statute. Defendant's counsel then presented defendant's records from DCFS, CPS, and IDOC, in addition to his PSI, and argued extensively about them before the trial court. In ruling, the trial court comprehensively reviewed *all* of defendant's records, not just some of his IDOC records, both orally in court and in its written opinion. Notably, the trial court specifically highlighted defendant's tragic upbringing in being born to a teenage mother and entering the DCFS system as an infant, experiencing the loss of foster mothers, his behavioral difficulties in school, and struggles with mental illness. It also noted that he maintained contact with his daughter and was employed before committing the instant offense.

¶ 61 The record also belies defendant's contention that the trial court did not consider the possibility that the sentence was unconstitutional. Defense counsel specifically raised the issue of the constitutionality of the mandatory life sentence during proceedings on remand. As stated, the trial court permitted the parties several opportunities for argument and to obtain additional records related to defendant's claim. Indeed, the trial court explained, "[t]hat's one of the reasons why I wanted to look at all the records because I know that you're saying mandated natural life without parole is unconstitutional." Instead of "automatically sentencing him to life," the trial court explained that it:

> "really was looking for some information to show that Mr. Robinson had turned
> his life around or tried to or worked on his aggression, particularly his
> aggression towards females possibly because of his relationship with his mother
> and his feelings of abandonment in order to consider that with your request to
> consider the statute unconstitutional. I'm not at this time willing to find the
> statute unconstitutional and I'm not willing to find Mr. Robinson has shown me

any change in his behavior or any attempts at recognizing his aggression and how to—deal with it so he is sentence to natural life without the possibility of parole."

¶ 62　Although it was bound by the mandatory sentencing statute, the trial court nevertheless specifically considered all mitigating factors related to defendant's culpability and rehabilitative potential, such as his difficult upbringing and struggles with psychological problems. The trial court thoroughly reviewed all records provided by defendant.

¶ 63　In short, defendant was afforded the opportunity to develop a factual record in an effort to show that his specific characteristics were so like those of a juvenile that imposition of the mandatory life sentence violated the proportionate penalties clause, absent the safeguards set forth in *Miller*. Despite the mandatory statute, the trial court considered defendant's individual characteristics and everything pertinent to defendant's level of culpability, future dangerousness, and rehabilitative potential. Given this extensive factual record and our analysis set forth above, defendant's mandatory life sentence does not shock the moral sense of the community in violation of the proportionate penalties clause.[3]

---

[3]In ruling, we note that, because defendant had the opportunity to create a factual record to support his claims and have the trial court examine his constitutional arguments, this case is distinguishable from others where young adult offenders asserted in preliminary postconviction proceedings that their mental conditions rendered them the functional equivalent of a juvenile, but they had not yet had the opportunity to explore these issues before a trial court. See *People v. Savage*, 2020 IL App (1st) 173135 (reversing summary dismissal of the defendant's petition for postconviction relief claiming that his 85-year sentence, imposed in 1995 long before *Miller*, violated the proportionate penalties clause where the defendant was 22 years old at the time of the offense and claimed that his long-term drug addiction in conjunction with his young age at the time of the offense rendered him the functional equivalent of juvenile); *Daniels*, 2020 IL App (1st) 171738, ¶¶ 1-2, 33-34 (the defendant made a sufficient showing of cause and prejudice to file a successive postconviction petition where he pleaded guilty to murder at the age of 18 and was sentenced to natural life imprisonment without parole in 1995, long before *Miller*, and asserted an as-applied, youth-based proportionate penalties sentencing claim in his petition based on "an unusually harsh childhood" and "a number of psychological conditions that could have inhibited his development," and the defendant "may be able to make a showing" that his psychological conditions rendered him the functional equivalent of a juvenile and he will outgrow them); *People v. Ross*, 2020 IL App (1st) 171202, ¶¶ 26-27 (finding that the defendant should have been granted leave to file a successive postconviction petition where he was 19 years

¶ 64    In sum, we reject defendant's constitutional challenges to the mandatory natural life sentence imposed on him following his conviction for aggravated criminal sexual assault.

¶ 65                                  III. CONCLUSION

¶ 66    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 67    Affirmed.

---

old at the time of the murder and argued that *Miller* applies to him because the evolving science showed his brain was still developing, he grew up with a father who was a drug addict and alcoholic, and the defendant was also a drug addict, and he was sentenced before *Miller* was a consideration); *People v. Bland*, 2020 IL App (3d) 170705, ¶ 14 (granting motion for leave to file successive postconviction petition raising as-applied proportionate penalties challenge to his 71-year sentence where he was 19 years old at the time of the offense and was sentenced 10 years before *Miller* was decided, and he pled enough facts to warrant further proceedings on his claim that *Miller* applies to him where he was diagnosed with an antisocial personality disorder and exhibited symptoms similar to characteristics of juveniles).

---

**No. 1-19-2289**

---

| | |
|---|---|
| **Cite as:** | *People v. Robinson*, 2021 IL App (1st) 192289 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 08-CR-18483; the Hon. Angela M. Petrone, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Sara Garber, of Thedford Garber Law, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, David H. Iskowich, and Retha Stotts, Assistant State's Attorneys, of counsel), for the People. |

---